## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-23-00291-JD |
| | ) | |
| DEWAYNE GEORGE RAMDIAL, | ) | |
| | ) | |
| Defendant. | ) | |

## __ORDER__

Before the Court is Defendant Dewayne George Ramdial's Motion to Suppress

Drugs Discovered as the Result of an Illegal Stop and an Illegally Extended Traffic Stop

("Motion") [Doc. No. 36], which the United States timely opposed [Doc. No. 41].

At the hearing on December 20, 2023, Mr. Ramdial personally appeared with his

appointed counsel, Gary W. Wood. The government appeared through Assistant United

States Attorney Thomas B. Snyder. The Court received the testimony of Sgt. Maurice

James, with the Canadian County Sheriff's Office. The government submitted as

evidence the previously submitted video and audio footage from the dashcam in Sgt.

James' patrol vehicle recorded on May 28, 2023, which is conventionally filed of record

at [Doc. No. 42], and portions of this exhibit were played during the hearing. The

government also offered and admitted other exhibits into evidence, which are attached to

its response at [Doc. Nos. 41-1, 41-2, 41-3, & 41-4].[1] The Court has reviewed the video

---

[1] Government's Exhibit No. 1 is Sgt. James' Incident/Offense Report [Doc. No. 41-1]; Government's Exhibit No. 2 is the dashcam footage conventionally filed at [Doc. No. 42]; Government's Exhibit No. 3 is the 5/26/23 Vehicle Detection Report [Doc. No.

and exhibits in their entirety. Following the hearing, both the United States and Mr. Ramdial submitted supplemental briefing at the Court's direction. *See* [Doc. Nos. 45, 46, 47].

Upon consideration of the filings and evidence presented, and having reviewed the relevant law, the Court issues its ruling on the Motion.

## I.      PROCEDURAL HISTORY AND BACKGROUND

Mr. Ramdial is charged in a two-count Indictment with drug conspiracy in violation of 21 U.S.C. § 846 and possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). [Doc. No. 17]. He seeks to suppress evidence obtained from a search of the vehicle he was driving on May 28, 2023, following a traffic stop on Interstate 40 in Canadian County. Mr. Ramdial challenges the initial traffic stop and its scope and duration. In response, the government asserts that the traffic stop was justified at its inception, and that Sgt. James had reasonable suspicion to extend the traffic stop to conduct a dog sniff.

## II.      FINDINGS OF FACT[2]

On May 28, 2023, around 6:12 p.m. (18:12:00), Sgt. James was on patrol traveling eastbound on Interstate 40 in Canadian County, Oklahoma, when he observed a 2019

_____

41-3]; and Government's Exhibit No. 4 is the 5/28/23 Vehicle Detection Report [Doc. No. 41-4]. The Court uses ECF page numbering in this Order.

[2] Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to "state its essential findings on the record" when deciding a motion that involves factual issues. The Court's findings of fact in this Order shall serve as the Court's essential findings for purposes of Rule 12(d). The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a

Nissan Murano driven by Mr. Ramdial commit a traffic violation, namely an improper lane change. Sgt. James[3] testified that the lane change was improper because Mr. Ramdial failed to signal his intent to change lanes 100 feet prior to initiating the lane change from the right lane to the middle lane of traffic. Instead, Mr. Ramdial initiated his signal simultaneously as he changed lanes, in violation of Oklahoma traffic laws.

In response to the observed traffic violation, Sgt. James manually activated his dashboard camera inside his patrol car. Sgt. James testified that the video footage from his dashcam automatically backs up 30 to 60 seconds from the moment that the camera is activated.

Although the signal from the Nissan Murano is not visible on the video during the lane change, Sgt. James testified it was his recollection that Mr. Ramdial did, in fact, initiate the signal simultaneously with the lane change. Sgt. James activated the emergency lights on his patrol vehicle, and his dashboard camera began recording audio at approximately 6:13 p.m. as evidenced by the notation "Mics" at 18:13:32 and "Lights" at 18:13:52 in Government's Exhibit No. 2 [Doc. No. 42]. Sgt. James can be heard at the

---

search or seizure. In deciding such preliminary questions, the Federal Rules of Evidence, except those involving privilege, do not apply. *See* Fed. R. Evid. 104(a). Thus, the Court may consider hearsay in ruling on a motion to suppress.

[3] In making its factual findings, the Court notes for the record that based upon its observations at the hearing (including his demeanor and body language and how he answered questions), the Court finds Sgt. James' testimony to be credible. *See, e.g.*, *United States v. Romero*, 247 F. App'x 955, 960 (10th Cir. 2007) (unpublished) (explaining that the "credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters most appropriate for resolution by the district court" (internal quotation marks and citation omitted)).

outset of the video conveying to the Canadian County dispatcher the description and license plate number of the vehicle. At that point, Sgt. James initiated a traffic stop of Mr. Ramdial and the Nissan Murano near Gregory Road on eastbound I-40.

Sgt. James approached the vehicle on the passenger side. On his first approach, Sgt. James noticed that the car had a specialty license plate honoring veterans, so he determined the Nissan was a personally owned vehicle and not a rental. Sgt. James asked Mr. Ramdial for his driver's license. Mr. Ramdial asked why Sgt. James had pulled him over, and Sgt. James explained that Mr. Ramdial had made an improper lane change when he moved from the right lane into the middle lane by signaling at the same time he started moving. Mr. Ramdial immediately responded that he was "trying to dance out of the debris." [Doc. No. 42 at 18:15:17]. Sgt. James testified that he had initially traveled in that same lane of traffic, and there was no observable debris in the roadway.

Mr. Ramdial produced a Florida driver's license, and Sgt. James asked him if he was still living in Orlando, Florida, and Mr. Ramdial said he was. Sgt. James inquired what Mr. Ramdial was doing in Oklahoma, and Mr. Ramdial said he had been at a tattoo convention in Albuquerque, New Mexico.[4] He indicated plans to attend another one in Houston, Texas, soon.

---

[4] Counsel for Mr. Ramdial in his argument at Motion hearing argued that Mr. Ramdial had his tattoo kit in the back of his car because he was doing work at a tattoo convention, but Sgt. James was never asked about the tattoo kit or any other items inside the vehicle during his testimony and none are referenced in his report. Additionally, the government in its supplemental brief at [Doc. No. 46 at 5] references Mr. Ramdial bringing along tattoo equipment to "bolster" his cover story. The Court does not make any finding that tattoo equipment was inside the car, nor does it factor this into its reasonable suspicion analysis since no reference to same was made by Sgt. James in his testimony or report.

Sgt. James asked Mr. Ramdial if the vehicle was registered to him, and Mr. Ramdial said the vehicle belonged to his friend who was letting him borrow it. He said it was his friend's company car and identified his friend's business as "Sin City."

At this point in time, Sgt. James returned to his patrol car at 18:17:17 to conduct the enforcement checks related to the traffic stop, including checking to see if Mr. Ramdial's driver's license was valid, his criminal history, and whether he had any outstanding warrants. Sgt. James testified that the first thing he did upon returning to his patrol car was call dispatch and request a check on warrants and Mr. Ramdial's criminal history. This is corroborated in the video starting at 18:17:37 [Doc. No. 42] when Sgt. James radios dispatch and the dispatcher responds, "go ahead." Sgt. James provides dispatch with Mr. Ramdial's full name, birthdate, and state of residence.

Sgt. James testified he knew he was going to do additional enforcement checks, because (1) a third-party vehicle was involved, (2) the presence of cross-country travel, and (3) the existence of a veteran's license plate on a company car, but he did not have any reason to suspect that Mr. Ramdial was engaged in any kind of illegal activity at that time. While he was waiting on the returns from dispatch, Sgt. James ran the Nissan Murano's license plate number through Motorola's license plate recognition ("LPR") database. Two entries in the database were significant to Sgt. James, and he verified by the photographs in the vehicle detection reports that both involved the same vehicle he had, in fact, just stopped. This same vehicle was spotted on May 26, 2023, at 2:21 p.m. CDT driving westbound on I-40 through the Texas Panhandle [Doc. No. 41-3] and again on May 28, 2023, at 8:29 a.m. CDT traveling eastbound on I-40 near the city of Gallup,

New Mexico [Doc. No. 41-4]. Sgt. James noted that Gallup is located near the state line of Arizona and New Mexico and is a significant distance west of Albuquerque, New Mexico, where Mr. Ramdial had claimed the tattoo convention had occurred.

Additionally, Sgt. James noted that this same vehicle had made this same trip in preceding months at roughly the same time of the month, possibly indicating coordinated monthly travel. Sgt. James testified that the long cross-country travel coupled with the quick turnaround time in this case by Mr. Ramdial was synonymous in his 30-plus years of law enforcement experience with drug trafficking.

Sgt. James also googled tattoo conventions in Albuquerque, New Mexico, on his computer while waiting on returns from dispatch. He was unable to find any documented tattoo conventions during the time that Mr. Ramdial claimed he was there. He did find conventions scheduled for June and July 2023.

At approximately 18:21:39 [Doc. No. 42], the dispatcher can be heard on the audio saying, "valid and clear, affirmative, negative." Sgt. James testified that was the dispatcher indicating that Mr. Ramdial's driver's license was valid, he had no outstanding warrants, and his criminal history showed no felony arrests pertaining to narcotics. Sgt. James testified that at that point the traffic stop was over; however, he believed he had reasonable suspicion to detain Mr. Ramdial. Considering the totality of what his additional enforcement checks had revealed, Sgt. James testified that he believed that Mr. Ramdial "was being deceitful about the true nature of his trip" and that he was possibly involved in criminal activity.

At 18:21:52 [Doc. No. 42], Sgt. James approached Mr. Ramdial, who was still inside his vehicle, and requested that he return with him to the patrol car. Sgt. James testified that he had already messaged Officer Preston Hodge, the K-9 officer, and requested that he come to the scene of the traffic stop to conduct a dog sniff when he approached Mr. Ramdial this second time. He testified that his message to Officer Hodge is audible on the video by a noticeable ping at approximately 18:20:33 [Doc. No. 42], followed by a second ping at approximately 18:20:40, which is Officer Hodge's return message indicating he is on his way.

Once inside the patrol car together, Sgt. James and Mr. Ramdial further discussed Mr. Ramdial's travel plans, the purported tattoo convention in Albuquerque, and how Sgt. James could find no information online regarding the convention. Sgt. James ultimately asked Mr. Ramdial if there was anything illegal in the car, to which Mr. Ramdial responded there was not. Sgt. James asked for consent to search the vehicle, and Mr. Ramdial denied consent. Sgt. James then waited for Officer Hodge to arrive.

At roughly 18:32:23, Sgt. James exited his patrol car to speak to Officer Hodge who had arrived on scene. According to the video evidence, it is about an 11-minute wait between the time the traffic stop is over, and Officer Hodge arrives to conduct the dog sniff.[5]

---

[5] Sgt. James testified that the traffic stop was over when the dispatcher came back with the "all clear," which according to the video was at approximately 18:21:39 [Doc. No. 42]. Sgt. James agreed that it took about 11 minutes from that point for Officer Hodge to arrive.

Upon arrival, Officer Hodge had his K-9 sniff the vehicle. After the sniff was complete, Officer Hodge advised Sgt. James that the K-9 gave a positive alert on the vehicle. Based on the positive alert, Sgt. James performed a probable cause search of the vehicle. According to Sgt. James, this search revealed kilograms of cocaine concealed in the vehicle.

### III.   RELEVANT LAW AND ANALYSIS

**A.   The traffic stop of Mr. Ramdial was reasonable at its inception due to Sgt. James' observation of an improper lane change under Oklahoma law.**

Mr. Ramdial begins by challenging the traffic stop. First, he asserts that his vehicle was obscured from Sgt. James' view by another vehicle in the same lane of traffic. Motion at 7. Second, he asserts that Sgt. James admits that Mr. Ramdial did, in fact, signal his intent to change lanes. *See id*. Third, Mr. Ramdial asserts that the facts, as stated by Sgt. James, are not a violation of Oklahoma's traffic laws. *See id.* at 7–8. The Court addresses each argument below.

***1)      There is no evidence of record that Sgt. James' view of the lane change was obstructed.***

The Court has reviewed Sgt. James' dashcam video footage. [Doc. No. 42]. In addition to relying on the video, the Court relies on Sgt. James' testimony, which the Court finds credible. For the first several seconds of the video, the Nissan Murano cannot be seen. There is a black SUV in the middle lane to the left of Sgt. James and a white SUV immediately in front of Sgt. James' patrol car. The Nissan Murano driven by Mr. Ramdial is in front of the white SUV. The Nissan Murano becomes visible around 18:12:59 in the video.

8

At approximately 18:13:02, the Nissan Murano executes a lane change from the right lane to the middle lane of traffic, completing the lane change at approximately 18:13:07. Sgt. James testified that although the signal from the Nissan Murano is not visible on the video during the lane change, it was his recollection that Mr. Ramdial did, in fact, initiate the signal simultaneously with the lane change. Although Mr. Ramdial asserts in his Motion that Sgt. James' view was obstructed, Sgt. James was never asked at the hearing if his view of Mr. Ramdial's vehicle was obstructed. Nor does the Court find any evidence indicating that Sgt. James' view was obscured. Sgt. James testified that he observed the lane change, and the lane change is visible on Sgt. James' dashcam video recording.

**2)** ***Although Sgt. James acknowledged that Mr. Ramdial initiated a signal, he testified it was initiated simultaneously with the lane change and in violation of Oklahoma law because Mr. Ramdial failed to signal his intent to change lanes 100 feet prior to initiating the lane change.***

Given the distance down the road the Nissan Murano was from Sgt. James' patrol car and the lighting in the video, the Court cannot discern whether a signal was, in fact, activated. The Court, however, relies on Sgt. James' testimony, which the Court finds credible. Sgt. James has consistently stated that Mr. Ramdial signaled simultaneously with the lane change. That was his testimony at the Motion hearing. Additionally, on the video when Mr. Ramdial asked why Sgt. James had pulled him over, Sgt. James can be heard explaining that Mr. Ramdial had made an improper lane change when he moved from the right lane into the middle lane by signaling at the same time he started moving.[6]

---

[6] Mr. Ramdial immediately responded that he was "trying to dance out of the debris." [Doc. No. 42 at 18:15:17]. Sgt. James testified that he had initially traveled in

[Doc. No. 42 at 18:15:13]. Sgt. James listed the same observed violation in his incident report, i.e., "The vehicle began changing lanes simultaneously to initiating a signal failing to give 100 feet of signaled intent prior to making the lane change as required by law." [Doc. No. 41-1 at 7]. Thus, Sgt. James' reason for why he executed the traffic stop has remained the same throughout this case.

Based on the evidence of record, the Court finds that Sgt. James witnessed a traffic violation, or at the very least possessed a reasonable articulable suspicion that a traffic violation had occurred or was occurring. The Court finds that Sgt. James' testimony coupled with his dashcam video is sufficient "to meet the low reasonable suspicion bar[.]" *See United States v. Anderson*, 62 F.4th 1260, 1267 (10th Cir. 2023). Thus, the traffic stop was justified at its inception.

A traffic stop is a seizure under the Fourth Amendment "and is subject to review for reasonableness." *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020). "To be reasonable, a traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to the mission of the stop itself." *Id.* (citations omitted). The Tenth Circuit has explained that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th

---

that same lane of traffic and saw no debris in the roadway. The Court's review of the video confirms no observable debris in the roadway. Additionally, Ramdial's explanation for his abrupt lane change corroborates Sgt. James' testimony this was a "quick lane change."

Cir. 1995) (en banc). And it is "irrelevant that the officer may have had other subjective motives for stopping the vehicle." *Id.*

Further, the constitutionality of the stop does not depend on whether the driver did, in fact, commit a traffic violation. The standard is reasonable suspicion of wrongdoing. If an officer reasonably thinks he saw a driver commit a traffic infraction, then that is enough to pull him over. *See, e.g.*, *United States v. Reyes*, 202 F. Supp. 3d 1209, 1213 (D. Kan. 2016) (explaining that the "propriety of a stop does not depend on whether the suspect is actually guilty of committing a traffic offense; rather, the relevant question is whether it was reasonable for the officers to believe the offense had been committed") (citing *United States v. Eckhart*, 569 F.3d 1263, 1271 (10th Cir. 2009) and *United States v. Cashman*, 216 F.3d 582, 587 (7th Cir. 2000)).

Sgt. James had reasonable suspicion that Mr. Ramdial was violating a traffic law under Okla. Stat. tit. 47, § 11-309. That provision requires that a "vehicle shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety and then given a signal, not less than the last one hundred (100) feet traveled by the vehicle, of his or her intention to change lanes." *See* Okla. Stat. tit. 47, § 11-309(2) (2021). Sgt. James testified that Mr. Ramdial signaled simultaneously with the lane change, and in violation of § 11-309(2), because he failed to signal his intent for 100 feet before initiating the lane change.[7] The Court credits Sgt. James' testimony combined with the video evidence. Thus, the traffic stop was justified at its inception.

_____

[7] The Court asked Sgt. James what his interpretation of § 11-309(2) was and what it required, and Sgt. James reiterated that it required 100 feet of signaled intent prior to making a lane change and that a simultaneous signal with a lane change was a violation

**B.**     **Sgt. James did not prolong the traffic stop in violation of the Fourth Amendment because he did not divert from the traffic-based mission of the stop in a way that prolonged it, and he had reasonable suspicion to extend the stop to conduct the dog sniff after the dispatcher came back with the "all clear."**

Mr. Ramdial asserts that the traffic stop was prolonged without reasonable suspicion of criminal activity. In general, an officer's actions during a traffic stop must reasonably relate in scope to "'the mission of the [traffic] stop itself.'" *United States v. Cates*, 73 F.4th 795, 805 (10th Cir. 2023) (quoting *United States v. Cone*, 868 F.3d 1150, 1152 (10th Cir. 2017) and *Rodriguez v. United States*, 575 U.S. 348, 356 (2015)).[8] Such actions include those steps necessary to issue a ticket or warning and other "ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance" *Rodriguez*, 575 U.S. at 355 (brackets and citation omitted); *see also United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015) ("It is well-established that, during a routine traffic stop, an officer may request a driver's license and registration, run requisite computer checks, and issue citations or warnings."). Additionally, an officer may ask about the driver's travel plans, *United States v. Williams* 271 F.3d 1262, 1267 (10th Cir. 2001), and about matters unrelated to the stop if those

_____

of the statute in his view. Mr. Ramdial cites to no legal authority to support a different interpretation of the statute, and his counsel agreed at the Motion hearing that the officer's interpretation of the statute controlled.

[8] A petition for certiorari was docketed on October 27, 2023, at Supreme Court Case No. 23-5903, and as of February 15, 2024, was distributed for conference of March 1, 2024.

questions do not prolong the length of the detention. *United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007).

However, a lawful traffic stop may not extend beyond the time "reasonably required" to effectuate the purpose of the stop. *Rodriguez*, 575 U.S. at 357; *see also United States v. Moore*, 795 F.3d 1224, 1228 (10th Cir. 2015). "[A]n officer's authority to seize [a driver] of a vehicle ends when 'tasks tied to the traffic infraction are—or reasonably should have been—completed.'" *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022) (quoting *Rodriguez*, 575 U.S. at 354). Thus, an officer violates the Fourth Amendment when he "'(1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that prolongs (i.e., adds time to) the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion.'" *Cates*, 73 F.4th at 805 (quoting *Frazier*, 30 F.4th at 1173). "The moment at which this reasonable suspicion becomes necessary is known as the '*Rodriguez* moment,'" *United States v. Leon*, 80 F.4th 1160, 1165 (10th Cir. 2023) (quoting *United States v. Batara-Molina*, 60 F.4th 1251, 1255 n.1 (10th Cir. 2023)), "i.e., the moment when the officer extended the stop by engaging in non-traffic inquiries." *Frazier*, 30 F.4th at 1179.

### 1) The Court finds that the "Rodriguez moment" occurred when the dispatcher came back with the "all clear."

Mr. Ramdial contends that the "*Rodriguez* moment" occurred about 1 minute and 5 seconds into the traffic stop when Sgt. James engaged Ramdial in "prolonged questioning" about the tattoo convention in Albuquerque. [Doc. No. 47 at 2]. Mr. Ramdial asserts that his responses to such non-traffic inquiries led Sgt. James to abandon

the mission of the traffic stop and investigate Ramdial's answers. Mr. Ramdial argues

that Sgt. James' failure to request proof of insurance and vehicle registration adds support

to his argument.

Alternatively, Mr. Ramdial asserts that the "*Rodriguez* moment" occurred when

Sgt. James returned to his patrol car and googled tattoo conventions in Albuquerque on

his computer and ran the vehicle's license plate number through Motorola's LPR

database. [Doc. No. 47 at 3]. Mr. Ramdial argues that Sgt. James became focused on

investigating Mr. Ramdial's statements and "did not take any action toward issuing Mr.

Ramdial a traffic citation or warning," but rather requested another officer come to the

scene with a drug dog, thereby further prolonging Mr. Ramdial's detention waiting for

the drug dog to arrive. *See id.*

The government contends instead that the "*Rodriguez* moment" occurred when the

dispatcher came back with the "all clear" at approximately 18:21:39 on the video. Sgt.

James testified that the traffic stop was over at that point; however, he believed he had

reasonable suspicion to detain Mr. Ramdial.

Under *Rodriguez*, the Court must first determine whether these activities by Sgt.

James diverted from the traffic-based mission of the stop in a way that prolonged it and,

if so, whether Sgt. James had the reasonable suspicion necessary to justify the

investigative detours when they occurred. *See Frazier*, 30 F.4th at 1173.

Here, the Court concludes that Sgt. James' questions about the tattoo convention

did not impermissibly deviate from the stop's primary mission. From the Court's review

of the video, Sgt. James' initial questioning of Mr. Ramdial lasts about 2 minutes

14

(18:15:02–18:17:09) and involves ordinary inquiries incident to a traffic stop—(1) he

asks for Mr. Ramdial's driver's license; (2) he asks if the car is registered to Mr.

Ramdial; (3) he explains why he executed the traffic stop; (4) he confirms that Mr.

Ramdial is still a resident of Florida; and (5) he inquires what Mr. Ramdial is doing in

Oklahoma, to which Mr. Ramdial offers that he has been at a tattoo convention. Sgt.

James asks where the tattoo convention was located, and Mr. Ramdial said it was in

Albuquerque and then further added that he planned to attend another one in Houston

soon.

Discussion of the tattoo convention lasts roughly 49 seconds and does invite some

back-and-forth conversation about Mr. Ramdial's employment as a tattoo artist.

(18:15:48–18:16:37). The Tenth Circuit has long held, however, that during a traffic stop,

"an officer may ask routine questions about the driver's travel plans." *United States v.

Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005) (citing *Williams*, 271 F.3d at 1267);

*Cone*, 868 F.3d at 1154 (explaining that travel plans typically relate to the purpose of a

traffic stop because the motorist is traveling at the time of the stop). Thus, an officer may

ask a motorist where he is coming from, where he is going, and how long he has stayed in

a particular city; these questions "are permissible as they fit into the travel plans rubric

and relate to the mission of the stop." *United States v. Cortez*, 965 F.3d 827, 839 (10th

Cir. 2020). Such questions "could cast light" on why Mr. Ramdial was in a hurry to

change lanes or "may help explain, or put into context, . . . if there was an urgency to

[his] travel." *See id.* (internal quotation marks and citations omitted).

Mr. Ramdial asserts that Sgt. James' failure to request basic documents, like proof of insurance, indicates his motives for the stop were not traffic-based. However, Sgt. James explained that because most states record vehicle insurance digitally, he generally obtains that information from his computer. He indicated he preferred this method over waiting on a driver who may have to search through papers in their glovebox.

Additionally, Mr. Ramdial's alternative "*Rodriguez* moment" ignores the timeline of events in evidence. Sgt. James testified that the first thing he did upon returning to his patrol car was call dispatch and request a check on warrants and Mr. Ramdial's criminal history. This is corroborated in the video starting at 18:17:37 [Doc. No. 42] when Sgt. James radios dispatch with Mr. Ramdial's full name, birthdate, and state of residence. Checking a motorist's criminal history and determining whether he has any outstanding warrants are ordinary inquiries incident to a traffic stop. *See, e.g.*, *Mayville*, 955 F.3d at 831 (explaining that the same rule applies whether the officer elects to run the criminal history check through dispatch or on his computer in his patrol car).

Only then, while Sgt. James is waiting on returns from dispatch, does he begin to conduct non-traffic inquiries. That is when he runs the Nissan Murano's license plate number through Motorola's LPR database and googles tattoo conventions in Albuquerque. There is no evidence of record, however, that these non-traffic inquiries prolonged or added time to the traffic stop. Likewise, Sgt. James' message to Officer Hodge at approximately 18:20:33 to arrange for a dog sniff did not prolong or add time to the traffic stop as he was still waiting on returns from dispatch. "Accordingly, the mission of the traffic stop was still ongoing when [Sgt. James] requested support from [Officer

Hodge]." *Cates*, 73 F.4th at 807 (concluding that the trooper's instant message to the other trooper to respond to his location and run his drug dog around the exterior of the car did not illegally extend the duration of the traffic stop).[9]

The Court agrees with the government that the *Rodriguez* moment occurred when the dispatcher came back with the "all clear" at approximately 18:21:39 on the video. At that point, absent reasonable suspicion that Mr. Ramdial was engaged in criminal activity, Sgt. James could not prolong the stop to wait for the drug dog because the tasks tied to the traffic violation were completed. *Mayville*, 955 F.3d at 830 (citing *Rodriguez*, 575 U.S. at 354). He acknowledged as such in his testimony.

**2)**    ***The Court finds that Sgt. James had reasonable suspicion to suspect that Mr. Ramdial was engaged in criminal activity at the Rodriguez moment.***

Although the government bears the burden of proving the reasonableness of the officer's suspicion, "'it is not an onerous one.'" *Leon*, 80 F.4th at 1165 (quoting *Frazier*, 30 F.4th at 1174). "Reasonable suspicion requires 'considerably less' than a preponderance of the evidence and 'obviously less' than probable cause to effect an arrest." *Pettit*, 785 F.3d at 1379 (quoting *United States v. Esquivel-Rios*, 725 F.3d 1231, 1236 (10th Cir. 2013)). To satisfy this standard, an officer is not required to "rule out the

---

[9] The Court agrees with the government's analysis in its supplemental brief at [Doc. No. 46 at 3–4] that the "import of *Frazier* to the present case lies in the importance of the timing of the *Rodriguez* moment in connection with any investigatory activity." Here, the Court can and does consider the LPR information in its reasonable suspicion analysis because the evidence is undisputed that Sgt. James immediately ran his traffic-based checks through dispatch and was waiting returns on that information when he conducted the LPR database research. Thus, the LPR search was not an investigative detour because it did not prolong or add time to the stop, and it occurred before the *Rodriguez* moment. *Frazier* is distinguishable. *See Frazier*, 30 F.4th at 1178–79.

possibility of innocent conduct" or have evidence suggesting "a fair probability of criminal activity." *Esquivel-Rios*, 725 F.3d at 1236 (internal quotation marks and citation omitted). Rather, the officer must have a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (internal quotation marks and citation omitted). Further, the existence of objectively reasonable suspicion "'does not depend upon any one factor, but on the totality of the circumstances.'" *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010) (quoting *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir. 1993)).

To decide whether the government has met its burden, the Court defers "to an officer's ability to distinguish between innocent and suspicious actions;" consequently, the "evaluation is made from the perspective of the reasonable *officer*, not the reasonable *person*." *Id.* at 1146–47 (internal quotation marks and citations omitted). The Tenth Circuit recently reiterated in *Leon* that "reasonable suspicion is a low bar." 80 F.4th at 1170. At the same time, however, it explained that the "articulated factors [cited by the district court] together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." *Id.* (internal quotation marks and citation omitted).

The Court finds that Sgt. James had reasonable suspicion to suspect that Mr. Ramdial was engaged in criminal activity when he extended the traffic stop following the

dispatcher's "all clear" for the 11 minutes it took for the drug dog to arrive. To the extent Mr. Ramdial attempts to analogize his case with *Leon*, it is distinguishable. Cases in the Tenth Circuit on implausible travel plans are "wide-ranging." *Simpson*, 609 F.3d at 1148. The Tenth Circuit has "'noted numerous times that implausible travel plans can form a basis for reasonable suspicion.'" *Id.* (quoting *United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007)). Generally, the Tenth Circuit has affirmed a district court's finding of reasonable suspicion when there were lies or inconsistencies in the defendant's described travel plans. *Id.* at 1148–49. For example, if a person claimed he left a city by car an hour ago, and the officer pulled that person over 200 miles from that city, then the officer could reasonably believe such travel plan was implausible and the person was lying. *See id.* at 1149. However, if a person's travel plans were "simply unusual or strange" that would be insufficient for reasonable suspicion. *See id.*

Mr. Leon was traveling from Phoenix to Denver to pick up some religious books and possibly stay for a religious event when he was pulled over by a Colorado State Patrol Trooper. *Leon*, 80 F.4th at 1163. The Tenth Circuit rejected the claim that Leon's travel plans gave rise to reasonable suspicion noting that they "were at most unusual, not logistically unrealistic." *Id.* at 1166. The court further noted that implausible travel plans can give rise to reasonable suspicion where it "begged credulity to think that the purported purpose of the trip could justify the travel plans." *Id.* (internal quotation marks and citation omitted). Finally, the court pointed out that there was nothing in the record indicating that Mr. Leon "was on a restricted timeline." *Id.* Ultimately, the court concluded that the factors cited by the district court for reasonable suspicion to extend the

stop were "not inconsistent with drug trafficking, but they [were] also not meaningfully indicative of drug trafficking." *See id.* at 1170.

The Court concludes that the information gathered by Sgt. James was significantly different than that at issue in *Leon* and eliminates a substantial portion of innocent travelers. For one, Mr. Ramdial's reported travel plans were logistically unrealistic. Two, he made misleading and likely false statements about his travel, based on what Sgt. James' investigation revealed. Three, the same vehicle had made this same trip in preceding months at roughly the same time of the month, possibly indicating coordinated monthly travel. Finally, Sgt. James testified that the long cross-country travel coupled with the quick turnaround time in this case by Mr. Ramdial was synonymous in his 30-plus years of law enforcement experience with drug trafficking.

Mr. Ramdial was in a company car that he borrowed from a friend.[10] He claimed that he had traveled from Orlando, Florida, to Albuquerque, New Mexico, to attend a tattoo convention. As the government points out in its supplemental brief [Doc. No. 46 at 5], it is helpful to construct a brief timeline of the trip to understand why Sgt. James suspected Mr. Ramdial was engaged in something other than routine law-abiding travel.

According to Google Maps, it is approximately 1,730 miles from Orlando to Albuquerque, which requires more than 24 hours of actual driving time one way. Assuming any reasonable pace of travel, stopping to eat, use the restroom, sleep, such a

---

[10] Sgt. James testified he knew he was going to do additional enforcement checks, because (1) a third-party vehicle was involved, (2) the presence of cross-country travel, and (3) the existence of a veteran's license plate on a company car.

trip would take a few days each direction for a typical law-abiding traveler. When Sgt. James ran the license plate through Motorola's LPR database, the vehicle was spotted on May 26, 2023, at 2:21 p.m. CDT traveling westbound on I-40 near Groom, Texas [Doc. No. 41-3], presumably enroute to Albuquerque if you follow Mr. Ramdial's purported travel claims.[11] Approximately 42 hours later, on May 28, 2023, at 8:29 a.m., the vehicle was spotted near Gallup, New Mexico,[12] already turned around and traveling eastbound on I-40 [Doc. No. 41-4]. Mr. Ramdial was stopped by Sgt. James about 9 hours later traveling eastbound on I-40 in Canadian County, Oklahoma, around 6:12 p.m.

Thus, taking Mr. Ramdial at his word, he was driving a third-party vehicle more than 48 hours to and from Orlando (straight without stopping) to spend less than 42 hours somewhere in New Mexico. Driving a vehicle registered to a third party who is not present can indicate drug trafficking. *Pettit*, 785 F.3d at 1382 (collecting cases). Likewise, cross country travel coupled with a quick turnaround contributes to reasonable suspicion. *United States v. Latorre*, 893 F.3d 744, 751 (10th Cir. 2018) (explaining that traveling a long distance, only to stay one night at one's destination, contributes to reasonable suspicion); *Contreras*, 506 F.3d at 1036 (concluding that unusual travel plans

---

[11] According to Google Maps, Groom, Texas, is about 328 miles east of Alburquerque, which is about a 4.5-hour drive on I-40. It is about 1,416 miles from Orlando, Florida.

[12] Sgt. James noted that Gallup is located near the state line of Arizona and New Mexico and a significant distance west of Albuquerque, where Mr. Ramdial had claimed the tattoo convention had occurred. According to Google Maps, Gallup is about 138 miles west of Albuquerque on I-40.

supported reasonable suspicion where the defendant drove "more than 1,200 miles to see her family, only to turn around within a day and begin the 1,200-mile drive back").

It appears more likely based on the LPR data, however, that Mr. Ramdial never stopped in Alburquerque, but rather drove somewhere farther west than Gallup before returning on May 28. His statements to Sgt. James about attending a tattoo convention in Alburquerque were likely false, or at the very least deliberately misleading, which is why Sgt. James could find no evidence of a tattoo convention on that date in Albuquerque. In the very least, there are inconsistencies and omissions in Mr. Ramdial's described travel plans. He offered no explanation for why he was in Gallup nine hours earlier, which is 138 miles west of Albuquerque; in fact, he never mentioned Gallup to Sgt. James.

Sgt. James also factored in the history of the vehicle, which the LPR database showed had made the same trip at least twice in the two preceding months. Drawing on his 30-plus years of experience and training in law enforcement, Sgt. James' obvious and logical conclusion was that Mr. Ramdial never stopped in Albuquerque and that he was lying about the tattoo convention. Sgt. James surmised that Mr. Ramdial was involved in illegal activity consistent with drug trafficking someplace near Gallup, New Mexico, or further west, and that his activities were inconsistent with innocent travel.

The Court finds, based on the totality of the circumstances and the facts available to Sgt. James at the time the dispatcher came back with the "all clear," that he had reasonable suspicion to believe that Mr. Ramdial was engaged in other illegal activity.

Thus, Sgt. James was justified in prolonging the traffic stop to wait 11 minutes for the drug dog to arrive.[13]

## IV.   **CONCLUSION**

For these reasons, the Court DENIES Defendant Dewayne George Ramdial's Motion to Suppress Drugs Discovered as the Result of an Illegal Stop and an Illegal Extended Traffic Stop [Doc. No. 36].

IT IS SO ORDERED this 16th day of February 2024.

_____
JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE

---

[13] Mr. Ramdial does not challenge that the K-9 alert provided probable cause to search the vehicle, nor does he challenge the actual search of the vehicle.